[Crim. No. 1283.    Fourth Dist.    Apr. 21, 1961.]

THE PEOPLE, Respondent, v. CECIL CHESTER PHIPPS et al., Appellants.

J. M. Lopes for Appellants.

Stanley Mosk, Attorney General, and Jack K. Weber, Deputy Attorney General, for Respondent.

GRIFFIN, P. J.—The indictment herein contained one count charging the defendants, Cecil Phipps and his wife Verna Phipps, with grand theft, in violation of Penal Code, section 487, in that they unlawfully took checks having a value of $3,054 from Tulare County between March 1, 1958, and January 31, 1959. After being found guilty by a jury, imposition of sentence was suspended for three years and the defendants were granted conditional probation. They have appealed from the judgment, from the orders denying their motions for a new trial and from the alleged order denying their motion to set aside the indictments. There is no record of this latter motion being made or denied.

On March 20, 1956, Verna Phipps applied for welfare payments for herself and her nine minor children. She disclosed that her husband was employed and living in the family home. A county welfare department worker advised her that these facts precluded granting welfare aid. However, Mr. Phipps was interviewed. He said his income was about $200 per month and that he had not abandoned his family and had no intention

of deserting them. The welfare worker determined that the family was not eligible for welfare aid and the application was denied. Subsequently, on October 2, 1956, Mrs. Phipps reapplied for welfare aid, stating that Mr. Phipps had been living out of the home since June 1956 and that his address was unknown. The welfare department authorized payment of aid on the basis that the children were deprived of parental support by reason of the absence of their father. On December 31, 1956, aid was discontinued because the welfare department found that Mr. Phipps was not absent from the family home.

Again, on June 13, 1957, Mrs. Phipps applied for aid from the welfare department, stating that she had filed for divorce that day and that she understood she could apply for aid under these circumstances. She filled out an application form requesting aid, in which she stated that Mr. Phipps was living outside the family home. Immediately above her signature on the form the following words appear:

"I will notify the county welfare department of any real or personal property transactions, change in income or other financial conditions, marriage of any of the above children, or remarriage of either parent of these children, of any change in address, or if a parent is absent from the home, any information regarding his address or whereabouts or his return to the home. I solemnly swear or affirm that the statements made herein are true and correct to the best of my knowledge and belief."

This provision was read to Mrs. Phipps before she signed the application. The previous application forms signed by Mrs. Phipps contained the same promise.

On the basis of this application, and under the belief that Mr. Phipps was absent from the home and that the Phipps children were thereby deprived of parental support, welfare payments were authorized and paid to Mrs. Phipps commencing on August 1, 1957, and continuing until January 31, 1959.

Considerable evidence was presented which indicated that the marriage of Mr. and Mrs. Phipps was not actually disrupted, that they were not living apart from each other, and that they had obtained welfare checks by falsely pretending that Mr. Phipps was absent from the home.

Alexander Wilson testified that Mrs. Phipps rented a home from him from the spring of 1957 until the end of March 1958. Mr. Wilson was introduced to Mr. Phipps during March 1958 at the Phipps home. During this month, the

witness saw Mr. Phipps at the home nearly every day for a two-week period. Previously, he had occasionally seen Mr. Phipps around the house on weekends. A service station operator testified that during 1958 the Phippses occasionally made purchases at his service station. Sometimes they were together and sometimes they came in alone. Both paid the bills. The proprietor of a grocery store located near the Phipps home testified that they made purchases in his store almost daily from June 1958 until January 1959. Sometimes they came to his store together and sometimes separately. Mrs. Phipps opened a charge account at the store and Mr. Phipps sometimes charged items to this account. Mrs. Phipps usually made the payments on this account, but sometimes Mr. Phipps indicated that certain items were to be charged separately to him and he paid for these items. Occasionally they paid cash for purchases. Both Mr. and Mrs. Phipps drove the same automobile.

James Durham, Sr., whose son married a daughter of the Phippses, was acquainted with Mr. and Mrs. Phipps. He saw the Phippses together at his son's home on several occasions between March 1958 and January 1959. Mr. Durham went north to work on the fruit harvest between April and September of 1958. He saw the Phippses at Yuba City where they stayed three or four days, sleeping together on a bed in the back of a Chevrolet panel truck.

James Durham, Jr., was married to one of the Phippses' daughters. The Phippses were together in his home for Christmas dinner in 1957. One morning during the spring of 1958 he went fishing with Mr. Phipps and during the trip he began conversing with Mr. Phipps about his going fishing all the time and not working. "Why should I work?" responded Mr. Phipps, adding the statement, "The county has to feed half of Tulare, they might as well feed my family also." During March and April of 1958, James Durham, Jr., visited at the new home of the Phipps family near Tulare several times each week. During the days Mr. Phipps was usually either working in the garden or fishing. In the evenings he would sit at home with the rest of the Phipps family watching television. The witness saw Mr. and Mrs. Phipps together at Yuba City early in May. They stayed two or three days. In August of 1958 he again saw them together near Shasta Lake.

A welfare department employee interviewed Mrs. Phipps at her home in May 1958 and observed Mr. Phipps in the back yard working in the garden. Mrs. Phipps stated that Mr.

Phipps did not live in the home but that he came over twice a week to work in the garden. There was testimony that Mr. Phipps occasionally transported his children to school and that he took one of them to a dentist's office to keep an appointment in January 1959.

Between 2 and 3 a. m. on January 28, 1959, investigators went to the Phipps home to investigate the truth of reports that Mr. Phipps was frequenting the home of Mrs. Phipps. The call was made at that unusual hour to preclude the anticipated explanation that Mr. Phipps was at the home for the purpose of visiting his children. As the investigators approached the home they encountered Mr. Phipps as he came out the back door. Mrs. Phipps and several of the children were inside the home. Both Mr. and Mrs. Phipps were fully dressed. She stated that Mr. Phipps had spent the evening there and they were still visiting and awaiting the return of a teenaged daughter who had gone out to attend a dance.

Mrs. Phipps and Mr. Phipps had a lengthy conversation with the investigators. Mrs. Phipps said that Mr. Phipps visited the home practically every day; that on many days he would spend several hours there but for the most part he lived with a son in Tulare; that when he spent nights at the residence he slept in a bed in the rear of a panel truck in the back yard; that he had helped around the house, did some of the cooking, took care of the yard and garden and fed the rabbits. Mrs. Phipps signed a written statement which said in part:

"Since I have moved here Cecil Phipps has lived on the premises off and on, a good part of the time. Part of the time he has stayed with our son . . . [in Tulare].

"On two or three occasions he has been out of town for a few days.

"Since last March Cecil has had his meals in the home. He has furnished part of the groceries for himself and the family. Cecil and I have talked on many occasions about his being here. We were aware that it could create ineligibility to receive welfare assistance. I have realized all along that I should have reported to the District Attorney or the Welfare Department that Cecil was in the home as much as he was."

On the next day, January 19, 1959, two of the investigators returned to the Phipps home to interrogate Mr. Phipps. They found him there doing work in the yard. He signed a statement including the following information:

"I moved back to Tulare in November 1957. I did not find employment here and have not been employed from Nov. 1957 to present date. The only income I have had is from watch repairing and Unemployment Insurance. From Nov. 1957, to present date I have grossed $900.00 in watch repairing, and received approximately $300.00 in unemployment insurance. In Nov. 1957 I started staying with my Son, Bob Phipps, 226 S. G. St., Tulare. I stayed with him steady until approx. one month ago. Since then I have been staying with my family. I don't sleep in the house. I have a bed in a panel truck in the back yard. Since Nov. 1957 I have been at the family residence practically every day. I have furnished part of the groceries for the family when I would have meals there. My wife and I have discussed my being in the home so much of the time in regards to her Welfare assistance. She did not want me to talk to them about it. I have paid my wife all the support money I could, from what I earned, which is approx. $500.00 since last April, 1958. I have read the foregoing and find it to be correct to the best of my knowledge."

Four days later, on January 23, 1959, Mr. Phipps' default was entered in the divorce action and Mrs. Phipps obtained an interlocutory decree of divorce. This was the first activity in the divorce action since the hearing of the initial order to show cause re child support payments and attorney's fees on August 5, 1957.

It was determined that the welfare department had paid $3,054 to the Phippses between March 1958 and January 1959, in sums ranging from $251 to $345 per month. These funds were paid on the basis that Mr. Phipps was absent from the home and that the Phipps children were deprived of his support. Had the welfare department known that this was not the case, the payments would not have been made.

We are satisfied that the evidence is sufficient to support the implied finding of the jury that Mrs. Phipps made false representations of fact with intent to defraud and that she had no intention of keeping her promise to report the return of her husband to the home if that event occurred. (*People* v. *Shirley,* 55 Cal.2d 521 [11 Cal.Rptr. 537, 360 P.2d 33]; *State* v. *Allison,* 173 Kan. 107 [244 P.2d 176].)

Mr. Phipps' participation in the crime consisted in setting up an ostensible separate residence while he had actually continued to live with his wife and family and entering into the family life, all the while knowing that the welfare payments were being made on the basis that he was absent

from the family circle. His statement that he had discussed with his wife the fact that he was in the home so much of the time and its relevance to the welfare payments shows that he understood the significance of his living in the home. That he shared his wife's criminal intent can be inferred from his statement to his son-in-law that he need not work when the county could support his family. There was sufficient showing of his active participation in the transactions with knowledge of their fraudulent character. He therefore aided and abetted in the commission of the crime and was punishable as a principal. (Pen. Code, § 31; *People* v. *Barker,* 53 Cal.2d 539, 543 [349 P.2d 73].)

Appellants contend that the prosecution was guilty of prejudicial misconduct in its closing argument. In the portion of his argument objected to, the district attorney contended that the evidence showed that the appellants had learned the eligibility requirements of the welfare program, that they decided to live on the welfare payments and that they devised a plan whereby they could chisel on the welfare program. There is no merit in this contention of appellants.

"In the argument before the jury, any reasonable inference may be drawn from the evidence, and it is a matter within the discretion of the trial court to determine whether counsel stays within the permissible range of discussion." (*People* v. *Eggers,* 30 Cal.2d 676, 693 [185 P.2d 1].) Far stronger language has been held not to constitute misconduct. (*People* v. *Carter,* 116 Cal.App.2d 533, 539 [253 P.2d 1016].)

An order denying appellants' motions to dismiss the indictment under Penal Code, section 995, if made, is not appealable, but is reviewable on appeal from the judgment. (*People* v. *Fernandez,* 172 Cal.App.2d 747 [342 P.2d 309]; *People* v. *Rebolledo,* 93 Cal.App.2d 261, 264 [209 P.2d 16].) An examination of the transcript of the proceedings of the grand jury discloses that there was sufficient evidence to support the indictment. The attempted appeal from this claimed order must be dismissed. The appeal from the judgment will be deemed to include the order granting probation. (Pen. Code, § 1237; *People* v. *Vetri,* 178 Cal.App.2d 385 [2 Cal.Rptr. 795].)

The purported appeal from the alleged order denying the motions to dismiss the indictment is dismissed. The judgment and order denying a new trial are affirmed.

Shepard, J., and Coughlin, J., concurred.