[Crim. No. 1842. Fourth Dist. Mar. 21, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. GATSY LEE WOOD, Defendant and Appellant.

Peter J. Hughes, under appointment by the District Court of Appeal, and Sheela, O'Laughlin & Hughes for Defendant and Appellant.

Stanley Mosk, Attorney General, and Jack E. Goertzen, Deputy Attorney General, for Plaintiff and Respondent.

GRIFFIN, P. J.—Defendant-appellant Gatsy Lee Wood was charged jointly with defendant Donald Evans with the crime of grand theft (violation of Penal Code, sections 484 and 487) between June 1, 1960 and August 31, 1961, and with conspiracy to commit the crime of grand theft (violation of Penal Code, section 182). Three separate overt acts are charged, i.e., (1) that about March 1, 1960, defendant Wood presented a written statement to the Department of Public Welfare, San Diego County, that she would notify the County Welfare Department of any change in income or financial conditions, when she had no intention of doing so; (2) that about March 8, 1961, she did the same thing; and (3) that defendant Evans, about March 1, 1961, promised to report his return to the home of defendant Gatsy Lee Wood to the Department of Public Welfare and to report his income and wages if and when he returned, when he had no intention of doing so.

A jury verdict was rendered against both defendants on each count. Gatsy Lee Wood was sentenced to Corona State Prison and only she appealed.

██ The principal complaint is that the evidence is not sufficient, as a matter of law, to support the verdicts. A summary of the prosecution evidence is that appellant and her codefendant, Evans, resided together and that each of them, during certain periods of time, worked and earned funds, which fact of cohabitation and earnings was not reported to the Department of Public Welfare. The evidence indicated that appellant, in March of 1960, prior to having met codefendant Evans, made application for aid to needy children. Subsequently, she met defendant Evans and they commenced living together, the codefendant being employed as an encyclopedia salesman during this period of time. About December of 1960, the relationship was brought to the attention of the Welfare Department and aid was stopped. Appellant subsequently, in March of 1961, contacted the Welfare Department and represented that she and the codefendant had separated. Aid to herself and a child which was born the preceding August was again commenced. Appellant thereafter sought and obtained employment, one place of employment having been the "Hollywood Theatre" (a burlesque theater), the place of employment and amounts received in wages not having been reported to the Welfare Department. Evidence indicated that after the renewal application in March of 1961, appellant and the codefendant again began residing together without reporting this fact to the Welfare Department. After various contacts with the Welfare Department and the probation office, which agency had supervision of other minor children of appellant, and after having received the last welfare check, appellant and the codefendant Evans contracted to purchase a $15,000 home, payable $150 per month. Welfare assistance was stopped and thereafter both appellant and the codefendant were arrested.

When appellant was five-months pregnant, she contacted the Welfare Department on February 29, 1960. On March 3, 1960, an application form was executed by her requesting aid for needy children, this application having been taken by a Mrs. Mare. At that time, appellant's attention was invited to the portion of the form wherein the applicant indicates that he or she will notify the Welfare Department of any change in financial condition or the return of the child's parent or stepparent to the home. Appellant testified that at the

time of executing the application she understood that she was promising to report income. The execution of this application is the first of the overt acts alleged in the information.

The theory of the prosecution with respect to payments received in 1960 was that there was an overpayment totaling $388 during this period, due to the fact that appellant and codefendant Evans were living together. The welfare worker determined that there had been association during the period of July, August, and September and that there was an overpayment of $388. The total overpayments during the period in question attributed to both unreported income and cohabitation with codefendant Evans was purportedly $606. Evidence was received to the effect that during this period appellant had earned $86.40 in March, $292.26 in April, $262.20 in May, and $63.70 in June at the Hollywood Theatre and that during July she earned $77.16 and $159.84 in August at the Turf Supper Club, which sums were not reported.

These defendants moved about and occupied, separately or together, about eight or ten different places of residence during the period in question. There is a conflict in the evidence as to whether defendant Evans occupied these premises all of the time during this period. Appellant's reason for not reporting her earnings at the Hollywood Theatre was that she feared the probation officers would take her child from her. She testified that her relationship with her codefendant was an ''off and on affair'' and that she did not know from one month to another whether a welfare check would come or not. She said that she knew it was important that she report changes in income and that the Welfare Department thoroughly instructed her about it; that her failure to report that defendant Evans moved in with her on occasions was that she was not sure he would always be there the next day. Evans was told during this period that as long as he was living with appellant he would be responsible for her support, under the stepfather clause, and that it might affect the amount being paid for the support of the child. Defendant Evans furnished the welfare worker with a copy of his federal income tax statement for the year 1960, showing $1,252.70 in income. He reported his income as approximately $400 per month as a salesman.

On occasions, the welfare worker called on appellant at her various addresses and on many occasions defendant Evans answered the door attired in Bermuda shorts or was shaving and acting as though he was living there. The utilities in

many of these places were taken out in the name of "Pat Evans." She was known to several landlords as "Pat Evans" or "Patricia Evans." The $15,000 home was purchased in the name of Donald E. Evans and Gatsy Lee Evans, as joint tenants. Many other transactions, too numerous to mention, were shown wherein appellant and her codefendant used these names and the addresses of appellant, which clearly indicated that appellant and the codefendant were actually living together as husband and wife. The baby called him "Daddy."

Appellant admitted that she had utilized these other names. She claims that she called one of the welfare workers about March 17, 1961, and told her that she was then working more than 48 hours a week but did not tell her that she worked at the Hollywood Theatre. She also admitted that she had received welfare aid prior to March 1960, under the name of "Schock," and that she had two other children on welfare at that time. Her claim was that she did not know that she would be ineligible for assistance if Evans was living with her, but believed it was only necessary for her to report the presence of someone else in the home as of the time she signed the application. She admitted having three telephones when living at one apartment.

While conflicting to a degree, there was sufficient evidence to support the verdict. (*People* v. *Phipps,* 191 Cal.App.2d 448 [12 Cal.Rptr. 681]; *People* v. *Barker,* 53 Cal.2d 539 [2 Cal.Rptr. 467, 349 P.2d 73]; *People* v. *DeCasaus,* 194 Cal. App.2d 666, 669 [15 Cal.Rptr. 521]; *People* v. *Little,* 41 Cal. App.2d 797, 804 [107 P.2d 634, 108 P.2d 63].)

The next complaint is that the trial court improperly allowed witnesses for the Welfare Department to testify as to the eligibility requirements and the amount of overpayments in the instant case. The claim is that the Welfare Department, from its knowledge of the facts, fixed a period during which Evans lived with appellant and, based upon this time, figures were produced showing the overpayments. It is argued that the opinion invades the province of the jury. (Citing *People* v. *Mason,* 183 Cal.App.2d 168 [6 Cal.Rptr. 649], and *People* v. *Ware,* 67 Cal.App. 81 [226 P. 956].)

It is conceded by counsel for appellant that the eligibility requirements for receiving assistance, and the computation of payments under the assistance program, are the duty of an expert to determine. Witnesses for the Department of Public Welfare testified in this respect. One such witness testified that if appellant had reported her earnings at the Hollywood

Theatre and the Turf Supper Club, and had reported that she had lived with Evans during August of 1961, the separately computed months of overpayments totaled $606. She stated that she used the aid to needy children manual to compute the overpayments. Another witness testified as to what part the association with Evans would play in the computations and what part was affected by unreported income, and also testified about the standard expense deduction which she had allowed appellant even though appellant had not ever reported the income. Appellant contends that this type of testimony permits the witness to testify on an ultimate fact and invades the province of the jury. The prosecution utilized this testimony to inform the jury of the factors which would or could alter the amount of assistance to appellant. It was left to the jury to decide if Evans and appellant did, in fact, have an association. It was left to the jury to determine if, in fact, unreported income was had by appellant. But, most important, it was left for the jury to determine the guilt or innocence of appellant, predicated on her intent in doing or not doing certain things. Implicit in all of the opinions of the Welfare Department witnesses was an assumption that if certain factors existed, what effect they had on the amounts of assistance to which appellant was entitled. The entire question of whether defendants were guilty of grand theft and of conspiracy to commit grand theft as charged, was left for the jury under the facts established. We perceive no error in this respect.

Next, it is argued that the court erred in refusing to allow appellant to show certain expenses as an offset of wages and income received at the Hollywood Theatre, in the nature of purchasing contact lenses, costumes and providing for baby sitters. It was shown that in computing the amount of overpayment, the Welfare Department did allow the standard $25 monthly deduction for ''necessary or reasonable employment expenses,'' even though she did not report it. She testified that under the act there was no way an applicant could recover in excess of $25 per month for this purpose. In addition, it appears that there was evidence that appellant expended the sum of $247.50 for contact lenses. This fact was already before the jury. The welfare expert testified that possibly gowns might be considered a proper deduction. Her expenses for gowns was approximately $150, plus $30 for alterations. She said that contact lenses would not be allowable. The objection to the question of the cost of baby sitting was

properly sustained by the trial court. Counsel for appellant believed this testimony was admissible to show lack of intent to defraud on the part of appellant. Appellant did not give this claimed expense as a reason for failure to report her income, but merely reasoned that if she did report it, it might have some effect on the question of the custody of her child. We do not believe any prejudicial error resulted.

 Error is claimed in the refusal of the trial court to give two proffered instructions of appellant bearing on the subject of time, i.e.:

". . . unless you are convinced beyond a reasonable doubt that a conspiracy existed prior to or at the time that one or more of the overt acts in the information were committed, then it would be your duty to acquit the defendants of the charge of conspiracy." (Citing *People* v. *Johnson,* 22 Cal.App. 362, 366 [134 P. 339].) The court refused these instructions as "covered." The court gave very cogent and full instructions on the question of conspiracy. One recites: "No agreement amounts to a conspiracy punishable in California unless in addition to entering into the unlawful agreement, an overt act is done within this State by any one of the conspirators for the purpose of accomplishing the object of the agreement. . . .

"But it is not necessary to the guilt of any particular defendant that he directly committed the overt act himself, if he was one of the conspirators *when such an act was committed.*

"The term 'overt act,' as used in the law of conspiracy, means any step or act by any one of the conspirators which goes beyond mere planning, agreement and intent toward the accomplishment of the object of the conspiracy, and which is done to effect that object." (Italics ours.)

It is obvious that under these instructions the jury could and did find that overt acts numbers II and/or III were done pursuant to a conspiracy entered into at a date prior to said acts. While the proffered instructions might well have been given, the instructions given sufficiently cover the subject matter. Repetition of principles of law is not required. (*People* v. *Hill,* 76 Cal.App.2d 330, 342 [173 P.2d 26].)

 The court gave an instruction in the language of Welfare and Institutions Code, section 103.3, and stated that the department was justified in asking for and relying upon ma-

terial information given by either or both defendants in respect to income, etc. The claim is that the court told the jury, as a matter of law, that an element of the People's case had been established, i.e., the materiality of a representation and the reliance thereon. By the instruction, the jury was not told that appellant or Evans had in fact misrepresented their relationship, nor that appellant or Evans had in fact any outside income. Thus, even though the jury was told that the Welfare Department could require certain information and rely on it, the ultimate question for the jury to determine was left to it, i.e., the existence or nonexistence of felonious intent in giving information or making promises to the department that would not be kept.

Claim is next made by appellant that the court erred in giving two instructions to the effect that: ". . . if the defendants, or either of them, were informed of his or her responsibility for reporting them, then such defendant who was so informed, was legally responsible for reporting those matters accurately and for reporting accurate and completely and promptly any changes regarding those matters."

The argument is that, applied to this appellant, the jury must have believed that once appellant established a relationship with the Welfare Department, she became an insurer so far as advising that agency of certain facts. (Citing *People* v. *Ashley*, 42 Cal.2d 246 [267 P.2d 271], and *People* v. *Shirley*, 55 Cal.2d 521 [11 Cal.Rptr. 537, 360 P.2d 33].)

We do not so construe the instruction given. The jury was told that a mere failure to act could support the criminal responsibility, but that an intent to defraud must be found, and that the intent to defraud could be predicated on the knowingly giving of false information or promising to keep the board informed of necessary factors without any intention of keeping said promise. (*People* v. *Phipps, supra,* 191 Cal.App.2d 448, 453.)

Lastly, appellant complains because the trial judge gave an instruction concerning corroboration of an accomplice's testimony. It appears that appellant's counsel did not request such an instruction, but it was requested by counsel for the codefendant. Had this instruction been given to the jury as applicable to appellant, no doubt it would have been error where no accomplice testified on behalf of the People. (*People* v. *O'Brien*, 96 Cal. 171, 181 [31 P. 45]; *People* v. *Arends*, 155 Cal.App.2d 496, 513 [318 P.2d 532]; *People* v. *Burnette*, 39 Cal.App.2d 215, 231 [102 P.2d 799].) Before giving it, however, the court remarked:

"Now there are certain rules of law to be used in evaluating the testimony of one who might be an accomplice of a co-defendant, and while neither of the defendants testified on behalf of the People, nevertheless to the extent that the testimony of either of them given from the witness stand might tend to incriminate the other, and I do not say that the testimony of either of them given from the witness stand tended to incriminate the other, that would be for your determination. . . ."

The judge went on and gave the exact instruction requested by the codefendant Evans. The judge was solicitous of both appellant Wood and codefendant Evans and was telling the jury that it should only be concerned with the accomplice instructions if the testimony of either one tended to incriminate the other. In that event, they should view that testimony with "distrust" and that corroboration would be necessary of that particular testimony which incriminated the other. This was not improper under the circumstances. (*People* v. *Marrone,* 210 Cal.App.2d 299, 312 [26 Cal.Rptr. 721].) No prejudicial error resulted. Actually, appellant Wood may have benefited by it. The codefendant Evans testified that in July of 1961, after he had moved back in with appellant, she received a welfare check and that she told Evans she had gone back on welfare assistance in March of 1961; that he asked appellant if she had reported her earnings from the Hollywood Theatre to the Welfare Department and appellant said, "No." The fact that the jury was told by the trial court to view any such incriminating statements of a codefendant with distrust militated to appellant's advantage.

Judgment affirmed.

Coughlin, J., and Brown (G.), J., concurred.