[Crim. No. 5333. First Dist., Div. One. Sept. 27, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. VIOLA SAMUEL, Defendant and Appellant.

John D. Nunes, Public Defender, and Richard M. Bryan, Assistant Public Defender, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Albert W. Harris, Jr., Assistant Attorney General, and Clifton R. Jeffers, Deputy Attorney General, for Plaintiff and Respondent.

SIMS, J.—Defendant has appealed from a "judgment" (order admitting her to probation) following her conviction under an information which charged her with four separate

offenses arising out of her applications for and her receipt of payments under the aid to families with dependent children program.[1]

In the first count she was charged with grand theft (Pen. Code, §§ 484 and 487, subd. 1) in that from November 18, 1963 through April 1964 she unlawfully took $657 from the County of Alameda. On this count she was convicted by verdict of the jury of petty theft (Pen. Code, §§ 484 and 488) as an included offense. The jury found her guilty as charged in the second count of grand theft in unlawfully taking $665 from the county during the period from April 15, 1964 through September 30, 1964. A verdict of guilty of violation of section 1577 of the Welfare and Institutions Code of the State of California,[2] an included offense, was returned to the third count which had charged violation of section 1550 of that code[3] in connection with an application executed by her on November 18, 1963. On the fourth count, the jury returned a verdict of guilty as charged of violation of section 449.4 of the Welfare and Institutions Code[4] in connection with an application executed by her on April 15, 1964.

---

[1]Former sections 1500-1580 of the Welfare and Institutions Code, repealed and reenacted in part in sections 11200-11487 by Stats. 1965, ch. 1784, §§ 3 and 5, pp. 3977-4019.

[2]Former section 1577 (Stats. 1961, ch. 1784, § 1, p. 3797, see § 11482 as added 1965) provided: ''Any person other than a needy child, as defined in Section 1500, who willfully and knowingly, with the intent to deceive, makes a false statement or representation or knowingly fails to disclose a material fact to obtain aid, or who, knowing he is not entitled thereto, attempts to obtain aid or to continue to receive aid to which he is not entitled, or a larger amount than that to which he is legally entitled, is guilty of a misdemeanor.''

[3]Former section 1550 (Stats. 1937, ch. 389, p. 1204 as last amended Stats. 1961, ch. 2107, § 1, p. 4370 and repealed and reenacted as § 449.4 (fn. 4, infra) by Stats. 1963, ch. 510, §§ 1.5, 2.1 and 42, pp. 1372, 1377 and 1391, operative 1/1/64) provided in part as follows: ''Every application for aid in behalf of any child shall be verified under oath, or shall contain a written declaration that it is made under the penalties of perjury. A county may require supplementary written statements in connection with an application for aid or the continuation of aid to be verified or signed under a like declaration. Any person signing any application or statement containing such declaration who willfully and knowingly, with intent to deceive, states therein as true any material matter which he knows to be false is subject to the penalties prescribed for perjury in the Penal Code of this State.''

[4]Former section 449.4 (Stats. 1963, ch. 510, §§ 1.5 and 42, pp. 1372 and 1391, operative 1/1/64, see § 11054 as added 1965) provided as follows: ''Each applicant shall be required before approval of assistance or services to file an affirmation setting forth his belief that he meets the specific conditions of eligibility. Such statements shall be on forms prescribed by the department and, in the case of applicants for aid under the provisions of Chapter 1 (commencing with Section 1500) of Part 2

Defendant contends that the evidence is insufficient to support the convictions, and that the court erred in delivering a portion of its charge prior to the conclusion of the taking of evidence between the direct and cross-examination of the defendant. It is concluded that the convictions are not sustained by sufficient competent evidence on issues which are relevant and material under the applicable statutes and regulations. It may be assumed that any irregularity in the manner in which the jury was instructed, whether erroneous or not, will not occur in the event of retrial, and no determination is made on that issue.

Defendant postulates that the issue on each of the charges is whether or not she falsely and fraudulently represented that she and her husband were separated and living apart. From this bastion she convincingly asserts that there can be no conviction of making false representation of absence and separation without proof of cohabitation and the maintenance of a normal family relationship between the mother and the father.

In addition to the foregoing issue the third and fourth counts each charge that she stated that she ''would report any information . . . concerning the whereabouts or return to the home of the absent father when in fact she had no intent to do so.'' The type of theft involved or the manner in which it allegedly was committed does not appear from the language used in the first two counts. From the record it is clear that these charges are based upon obtaining welfare funds through false representations or concealment and fall within the definition of theft by false pretenses. (See *People* v. *Darling* (1964) 230 Cal.App.2d 615, 617 [41 Cal.Rptr. 219].)

■ ''To support a conviction of theft for obtaining property by false pretenses, it must be shown: (1) that the defendant made a false pretense or representation, (2) that the representation was made with intent to defraud the owner of his property, and (3) that the owner was in fact defrauded in that he parted with his property in reliance upon the repre-

of Division 2, shall contain a written declaration that the affirmation is made under penalty of perjury. Any person signing a statement containing such declaration who willfully and knowingly with intent to deceive states as true any material matter which he knows to be false is subject to the penalty prescribed for perjury in the Penal Code. A copy of the affirmation shall be furnished to the applicant at the time he files it.

''A county department may also require like statements to be completed prior to approving restoration of aid as provided by Section 449.1 and may require new statements at any time for purposes of continuing assistance.''

sentation. [Citations.]'' (*Perry* v. *Superior Court* (1962) 57 Cal.2d 276, 282-283 [19 Cal.Rptr. 1, 368 P.2d 529].) Since the representations allegedly relied upon are not set forth in the theft charges, the issues may extend beyond that postulated by defendant, and beyond the charges in the perjury counts.

The People have adopted a scatter-gun approach to meet defendant's contention. It is suggested (1) that the evidence is sufficient to show the falsity of the representation that defendant and her husband were not living together, and the related fraud in promising to but failing to disclose the true situation, (2) that the evidence supports a finding of lack of absence and separation because there was no ''disassociation'' as that term is used in defining eligibility of the child for assistance because of the continual absence of a parent from the home, and (3) that the evidence supports a finding that the defendant made written and oral representations that she would report immediately any change in living plan, employment, income, gifts and property and any relationship with any man whether living in the house or not with the intent (presumably demonstrated by her subsequent conduct) not to report any changes in her family status and her relationship with any man.

*The facts*:

Defendant met Ronnie Samuel while she was attending the University of California at Berkeley in the spring of 1962. He visited her twice at her home in Long Beach in the summer of that year and she went out with him again on returning to the university in the fall. She was on probation because of poor grades in her first year and sensing that she was in danger of flunking out she made arrangements to and did drop out in the fall semester.

In December 1962 she discovered she was pregnant as a result of intimate relations with Ronnie the previous October. She arranged for a marriage in February, but Ronnie refused, saying he was never going to get married. Subsequently, defendant and her mother prevailed upon Ronnie to go through a marriage ceremony in Long Beach on April 7, 1963.

After the wedding the couple drove back to Richmond with a friend of defendant. Ronnie led defendant to believe that the expected child was her burden and told her she could apply for aid. He returned to an address in San Francisco where he had been living for the past four years. Defendant stayed with her friend in Richmond for about a week and then moved into

a nearby apartment. In July 1963 she applied for aid for her child from the Contra Costa County Welfare Department. On August 1, 1963 the child was born, and that month defendant moved to Alameda County to be closer to her father's relatives in East Oakland. She was granted aid by Contra Costa County and received payments of approximately $140 per month through November 1963, although delivery of one check was held up because of her failure to keep a requested appointment.

In connection with the transfer of her application for aid to Alameda County she was interviewed by a representative of that county on November 18, 1963 at her new address. At this first meeting defendant's eligibility and budget were discussed. The social worker explained that the basis of her eligibility was "because her husband, also the baby's father, was absent. This was the important point in her case, and we covered it quite thoroughly." Defendant told the worker that there was not a natural marital relation, that she and her husband "had not lived together continuously," and that they had never lived together. Their marriage was not successful, according to defendant, because it was only to legitimize the baby.

At this time defendant signed two printed forms to obtain aid. Exhibit 1 is entitled "Applicant's Statement." It states that a recipient has these responsibilities: "1. To report immediately any change in living plan, employment, other income, gifts, and property," and "2. To report immediately, and explain to my social worker, any relationship with any man whether living in my home or not." A budget and grant of $131 per month was stated. Exhibit 1 also read: "I further understand that failure to follow any of the above could result in my case being discontinued and further action being taken regarding aid for which I was not eligible." Those are the substance of her representations on that form. They appear over her witnessed signature without any jurat.

Exhibit 2 is entitled "Statement of Facts Relating to Eligibility for Aid to Needy Children." In relevant part it read, "I hereby make the following statement of facts relating to eligibility for Aid to Needy Children," and thereafter under "Deprivation Status" defendant indicated that she was separated from Ronnie. At the end of the form above her signature this warning appears: "Any person who signs this statement and who wilfully states as true any material matter which he knows to be false is subject to the penalties prescribed for

perjury in the Penal Code by the State of California. Sec. 1550 of the W&I Code. I will notify the county welfare department of any real or personal property transactions, change in income or other financial conditions, marriage of any of the above children or remarriage of either parent of these children, of any change in address, or if a parent is absent from the home, any information regarding his address or whereabouts or his return to the home. *I solemnly swear or affirm that the statements made herein are true and correct to the best of my knowledge and belief. I am aware that it is unlawful to give false information.*"

It appears that prior to executing these applications the defendant had indicated to the landlord when she rented the apartment in Oakland that her husband would be living with her. She also had accompanied her husband to financial counselors in San Francisco and signed documents with him there in which each gave the Oakland address. On October 24, 1963 defendant had joined her husband in signing an application for credit in his name at the Oakland address with John Breuner Company for the purchase of a sofa and tables for $165.88. According to defendant the furniture was repossessed because of Ronnie's poor credit rating and the application recites "Declined 10-31-63 No more." On November 12, 1963 she had joined with Ronnie in securing a loan from the Household Finance Corporation of San Leandro in which they jointly gave the Oakland address. The forms reflect that of a total obligation of $264, $67.27 represented precomputed charges, $2.68 insurance, $111.56 the amount necessary to satisfy a debt owed the San Francisco office of Household Finance Corporation, and that $82.49 was advanced to the borrower. According to the lender and the defendant these funds were for the purchase of an automobile. She testified it was purchased and used by Ronnie personally and was subsequently repossessed.

The verdict of the jury on the first and third counts is incompatible with a finding that the foregoing facts evidenced a violation of the provisions of section 1550 in connection with the application executed November 18, 1963. The conviction of a violation of the provisions of section 1577 is an acquittal of a violation of the perjury provisions of section 1550. (*In re Hess* (1955) 45 Cal.2d 171, 175-176 [288 P.2d 5] ; 1 Witkin, California Crimes (1963) § 201, p. 193.) The conviction of petty theft is an acquittal of grand theft of the $657 paid to her during the months commencing with December 1963

through April 1964. (*Gomez* v. *Superior Court* (1958) 50 Cal.2d 640, 652 [328 P.2d 976] ; Witkin, *op. cit.*, § 202, p. 194.) It is either a mere compromise verdict, or it indicates that no more than one monthly payment during that period was paid and received as a result of defendant's "false pretenses." Further inquiry into her conduct during the period is indicated.

On December 21, 1963 defendant went to the Red Barn Furniture Company with her husband. She left him in the car and purchased a couch and chair for a recited price of $168.35. She alone signed a conditional sales contract giving their joint names at the Oakland address as purchasers, and reciting a cash balance of $93.00 which was swelled to $180.35 by financing charges.

In January 1964 the husband unsuccessfully applied for a loan for the purchase of an automobile at a San Francisco bank and gave the Oakland address. There is nothing to show that defendant was a party to this transaction. Meanwhile he had given his employer the Oakland address. He listed defendant's child as a dependent for income tax purposes, and for the health plan to which he was entitled by virtue of his employment. When he succeeded in getting an automobile in the spring of 1964 he registered it at the Oakland address. It also appears that the employer knew of the wife's earlier Richmond address because a baby present was received by her through the mail from the employer. Defendant denied she was aware that her husband had given her address as his residence at his place of employment until so advised by an investigator in September 1964. She admitted that she had received a card and knew that their child was eligible for services under the health plan. (The husband had sired another elder child, and according to the defendant this child, who was about five years old in June 1965, and that mother were supported by aid from the San Francisco Welfare Department and also received the benefit of the father's health insurance.) She denied that she ever drove the car purchased by her husband.

On February 10, 1964 another joint application was submitted to Household Finance Corporation in San Leandro and rejected.

On February 24, 1964, under penalty of perjury, defendant signed a "Certification of Need and Income" in which she stated that no one was living in the home other than herself and her child and that she had received no contribution from

the absent parent, who was listed at the San Francisco address, during the months of November, December and January. This form contained a recital reading as follows: "I will immediately notify the County Welfare Department of any real or personal property transactions, change in income, or other financial conditions, change of persons living in the home, marriage of any of the above children, or remarriage of either parent of these children, any change in address, or, if a parent is absent from the home, any information regarding his address or whereabouts or his return to the home."

There is no evidence of any other conduct involving defendant or her husband prior to the receipt of the April 1964 aid payment, except her conversation with social workers in November 1963 and February 1964. At the first meeting with the Alameda County worker defendant was advised that if she should resume any type of relationship with her absent husband it should be discussed with the case worker so that a determination could be made as to how it would affect her eligibility. The worker could not remember whether they specifically reviewed the effect of an act of sexual intercourse with her husband on defendant's eligibility. At the February interview a second worker asked her to report any change of income or in the household composition.

On April 15, 1964 defendant executed two new forms which were respectively similar to Exhibit 2, and to the form signed in February. At this visit she reported she had received $100 from her mother and father in April and May of 1963, and recited that her husband was absent from the home and had not contributed to the support of the child. She was advised "to report any change in income, household composition—that is who is staying in the house—and whether or not she has had any relationship with any man, a steady relationship with a man." No such relationship was reported. She was not asked about joint credit applications, nor did she advise the worker that such applications had been made.

The following month defendant and her husband drove to Long Beach in her father's car to see her mother. On this trip she admittedly had intercourse with her husband, became pregnant and ultimately gave birth to a second child January 3, 1965. According to each of them, each returned to his or her separate residence on their return from the trip.

In the latter part of May the defendant and her husband jointly executed an application for credit with Rhodes Department Store. The store declined to extend credit at the time the

application was made and the following day, upon receiving a credit report, declined the account entirely. The representative of Household Finance indicated that a joint application for a loan was made and rejected July 3, 1964.

In the latter part of July the defendant first became aware that she was pregnant. She conceded that this was a circumstance she felt and understood she should report but she never got around to doing so.

On September 23, 1964 defendant swore to another "Certification of Need and Income" before the same worker who had interviewed her in February and April. This certificate covered the months of June, July and August, and gave negative replies in respect to questions framed to ascertain whether there were other persons living in the house, and whether she had any other source of income. The husband's address, which had previously been by number and street in San Francisco, was designated merely by the name of the city. She did not disclose to the worker that she and her husband had jointly applied for credit, that her husband had visited her and the child intermittently, that she had taken the trip with him, nor that she had had intercourse with him and became pregnant.

On September 29th, defendant was interrogated by an investigator from the district attorney's office. Her admissions in that interview are embraced within the facts set forth above. He advised defendant that everything he discovered in his investigation led him to believe that she had lived with her husband, and that her aid was going to be stopped. Payments terminated with the stipend for September.

No direct evidence was offered to show that the husband ever lived in the apartment occupied by defendant and their child, or to show that he was other than absent from the home, or that he returned to the home. The defendant testified that she did not take up permanent living residence with her husband at any time after their marriage, that her husband visited her and the child "off and on when he felt like it," perhaps once a month including the occasions on which they attempted to obtain credit, that he never took her out, and that the only times they had sexual intercourse was during the vacation trip to Long Beach. Ronnie also denied that they had ever lived together as husband and wife. He testified that he saw her about four times at the Oakland address and that he never stayed overnight or had intercourse with her there.

The man who managed the Oakland apartment from the middle of May, who checked the premises twice a day, was

around in the yard cleaning up or watering early in the morning and in the late afternoon and who lived right above defendant had never seen the husband before the trial. Ronnie's rental of a room in San Francisco, was corroborated by the sister of the former owner, who inherited the building on the latter's death in February 1964.

A friend testified that she had driven the couple back from the wedding, that she saw the husband once at the Richmond address, and once again at Oakland, but on no other of her frequent visits. A relative who moved the defendant from Richmond to Oakland and back again, and who visited once or twice a week in the defendant's Oakland apartment never saw any evidence that indicated a man was living with her, and only saw the defendant on one occasion when he called with defendant and her mother.

Defendant at all times advised the authorities of her husband's San Francisco address and the name and address of his employer. Although at one time she was reluctant to cooperate with the Contra Costa district attorney in regard to proceedings to enforce the support obligation of her husband, she did in fact go to his office and later to the office of the Alameda County district attorney.

An investigator for the Alameda County Welfare Department prepared an overpayment computation and testified that all payments from December 1963 through September 1964 were allegedly made at a time when she was totally ineligible for assistance because ''there had not been clearly disassociation between Mrs. Samuel and her alleged spouse . . .'' He stated his conclusion was ''Based upon the fact that we uncovered facts that indicated they had represented themselves to the community as man and wife to obtain credit; they had vacations together during the period of receipt of assistance; a child had been conceived during the vital period of assistance of grants; and we had certain other representations that he had indicated that these people were dependent upon him for income tax purposes or deductions, at least.''

The provisions of several regulations governing welfare payments were brought out in connection with the examination and cross-examination of this witness. On the subject of deprivation of support (see Welf. & Inst. Code, former § 1500, present § 11250) he read from a handbook and part of the regulation defining continued absence from the home,[5] and a

---

[5]The witness testified: ''Subsection 1 states, 'Separation or desertion where there has been no legal action. In these situations the parents

handbook comment on the effect of visits or contributions.[6] He acknowledged that his conclusion was in part predicated upon regulations promulgated under the subject of responsible relatives, particularly the subject of the responsibility of a man assuming the role of spouse. (See Welf. & Inst. Code, former § 1508, present § 11351.) Portions of the manual were read to the jury.[7]

---

have separated by mutual agreement or one parent has deserted the other. The parent may be married or may have been living in a common law relationship. In either case eligibility depends upon whether or not there is a clear disassociation.' Then it gives the example: 'A rupture in the normal family relationship, if the absent parent is away for a specific purpose, such as job finding, service in the armed forces, working in another locality with the intent to return home, or to send for his family at a later date, there is no disassociation and eligibility does not exist. There is deprivation on the basis of absence if the separation or desertion occurred at least three months prior to the application.' '' (See California-SDSW-Manual-ANC, Issue No. 16-10 issued 5/1/57, Handbook § C-161.20, par. 1); and ''C-161.20 says, 'Continued absence from the home. There is continued absence from the home if the parents are living separate and apart.'

''Subsection 1: 'The parents are separated without legal action or a parent has deserted, there is clear disassociation of one or both parents from the normal family relationship, and the separation or desertion occurred three months prior to the date of application—' '' (See California-SDSW-Manual-AFDC-rev. 712, effective 7/1/64, Regulations § C-161.20, par. 1.)

[6] The witness testified: '' 'Visits of an absent parent to the home to see the child do not affect eligibility on the basis of absence, since such visits should be encouraged in most instances as one way of working toward the strengthening of family ties. Contributions of an absent parent to the support of the child does not affect eligibility on the basis of absence. Visits of short duration by the mother or children to see a departed father do not affect eligibility on the basis of absence. Short visits should be interpreted as visits which, in the aggregate, do not result in a substantial normal family life for the parents and children on a continuing basis.' '' (See California-SDSW-Manual-ANC, Issue No. 16-11, issued 5/1/65, Handbook § C-161.23.)

[7] The witness related: '' 'Responsibility of man assuming the role of spouse, the following factors may substantiate the existence of the criteria mentioned in the regulation. No. 1: A man in spouse-like relationship, subsection 8, [sic] relationship has continued over a period of time, that is, more than casual—'

'' 'B: Admitted intimate relationships, and/or birth of children. C: Consistent, relatively regular and frequent contacts with the mother.'

''Under 2 it states: 'Man has assumed financial obligations.' . . .

''Subsection A: 'Man has paid family bills, opened charge accounts jointly, or in his name, for use of the family, or similarly obtained credit for the benefit of the family. B: The man has paid medical or other bills incurred by the family. C: Man has claimed mother and chilren as dependents [sic] in filing income tax.' . . . under No. 3 it states: 'Man represents self as spouse-like, a [Sic A] representation to others, such as landlord, friends, community, as husband and wife.' . . .

'' 'G: Use of ANC family's address by man for mail, employment records, hospitalization, arrests, et cetera.' . . . 'These factors should not be considered as exclusive listing [sic] where other similar facts when found

*The Sufficiency of the Evidence.*

■ Preliminarily it is recognized that if there is any evidence to sustain one of the verdicts it must be upheld. (*People* v. *Wood* (1963) 214 Cal.App.2d 298, 303 [29 Cal.Rptr. 444]; *People* v. *Rozell* (1963) 212 Cal.App.2d 875, 877 [28 Cal.Rptr. 478]; *People* v. *Flores* (1961) 197 Cal.App.2d 611, 615 [17 Cal.Rptr. 382]; *People* v. *DeCasaus* (1961) 194 Cal.App.2d 666, 669-672 [15 Cal.Rptr. 521]; *People* v. *Phipps* (1961) 191 Cal.App.2d 448, 453 [12 Cal.Rptr. 681].) The entire course of conduct between defendant and the welfare department is not only opened up by the two grand theft charges, but also must be considered for the light it throws on the particular incidents which are the subject of specific charges. (*People* v. *Ryerson* (1962) 199 Cal.App.2d 646, 651 [19 Cal.Rptr. 22]; and see *People* v. *DeCasaus, supra,* 194 Cal.App.2d 666, 671-672.) ■ The regulations and rules were properly considered insofar as they related to proof of the materiality of the representations made by defendant and reliance thereon by the county. (*People* v. *Wood, supra,* 214 Cal.App.2d 298, 303; *People* v. *DeCasaus, supra,* 194 Cal.App.2d 666, 673-674; and see *County of Kern* v. *Coley* (1964) 229 Cal.App.2d 172, 180 [40 Cal.Rptr. 53].)

■ In the third count it is alleged that on November 18, 1963 defendant stated that she was separated from her husband when in fact she was not. As noted above the jury acquitted the defendant of the felony charge under this count, but found that she was guilty of a misdemeanor involving a false statement or representation, not necessarily under oath, or a failure to disclose a material fact.

The evidence fails to show that at that time she was not in fact separated from her husband. The representations to the landlord, the financial counselors, Breuners and Household Finance that she and her husband were living at the Oakland address may show attempts to deceive the landlord and to defraud creditors. They may be used to impeach the testimony of defendant and her husband, or at most, may constitute an admission or partial confession of an element of the charged

---

to support Item 1, 2 or 3, may be used. On the other hand, the existence of a single factor may not be conclusive proof that the criteria are met.' . . . 'For example, a man in a courtship relationship might take the children on outings, provide gifts or even discipline them. This fact alone would not be proof of a spouse-like relationship.' '' (See California-SDSW-Manual-AFDC-rev. 518 and 805 issued 6/1/63 and 10/1/65 respectively, Handbook § C-155; and *id.* rev. 767, effective 4/1/65, Regulations, § C-155, par. A.)

perjury, but in the absence of any proof of the actual physical presence of the husband they cannot sustain a conviction for the falsity of the representation that they were separated. There must be other proof of the corpus delicti before the extrajudicial declaration can be used. (*People* v. *Davidson* (1964) 227 Cal.App.2d 331, 336 [38 Cal.Rptr. 660].)

Moreover, "In prosecutions for perjury, the falsity of the sworn statements of the defendant must be evidenced by the testimony of two independent witnesses or by one witness and corroborating circumstances. (Pen. Code, § 1103a; Code Civ. Proc., § 1968.) It is firmly settled in this state that *direct*, as distinguished from circumstantial, evidence of the falsity of defendant's testimony is required from at least one witness. [Citations.]" (*People* v. *O'Donnell* (1955) 132 Cal.App.2d 840, 844 [283 P.2d 714]; and see 41 Am.Jur., Perjury, §§ 65 and 66, pp. 35-37, particularly fn. 17, p. 37; and cf. § 69, pp. 38-39; 70 C.J.S., Perjury, §§ 67-70, pp. 534-542; and cf. § 70, subd. c.(3), p. 540.)

From the foregoing it is clear that the jury correctly rejected a finding of the falsity of the allegation referred to. The same considerations apply to the allegation of the fourth count that on April 15, 1964 she stated that her husband was absent from her home when in fact he was not. The only new facts bearing on the issue of his presence or absence in the home arose after November 18th were the credit application and purchase of furniture from the Red Barn, and an apparently rejected application to Household Finance.

Each perjury count further alleges that on November 18, 1963 and April 15, 1964, respectively, perjury was committed in that a promise of future disclosure was made without the intention to perform it. The allegation is "that said defendant would report any information . . . concerning the whereabouts or return to the home of the absent father when in fact she had no intent to do so." These allegations are based on the recitals contained in the forms which have been reviewed in the facts. If it be assumed that the evidence justifies a finding that the defendant, at the time she filled out and swore to the truth of the applications, had the intent to withhold and conceal such information, there is still, for the reasons set forth above, a dearth of competent evidence to establish that any facts allegedly concealed ever existed. She candidly gave her husband's address and place of employment each time it was requested, and except for the declarations,

which have been discussed above, there is no evidence to show that he ever returned to her home.

Furthermore, it is questionable whether an affirmation as to future conduct can be the subject of perjury. (70 C.J.S., Perjury, § 6, pp. 462-463; 2 Witkin, Cal. Crimes (1963) § 841, p. 789; and cf. Pen. Code, § 120.)

From the foregoing it is concluded that defendant's conviction on the fourth count which charges perjury must be reversed. The verdict finding the defendant guilty of a misdemeanor under the allegations of the third count can have no better fate. An allegation of the commission of a particular felony in a particular manner on a particular date may not justify conviction of a lesser included offense in regard to other particulars on different occasions. The language of the statute creating the misdemeanor offense may circumvent the objection that perjury will not lie for a promissory representation. The record, however, fails to show that the facts which she allegedly intended to conceal ever came into existence. There is a failure to prove that she had information concerning his whereabouts which was not divulged or that he ever returned to the home. Mere intent to conceal in the future without actual concealment should not be actionable civilly or criminally.

Are there representations upon which the theft charges may be predicated? It is recognized that a promise to divulge which is made with an intention not to perform it, may serve as the predicate for theft by false pretenses when the victim, who is misled by a subsequent concealment, transfers value to the promissor. (*People* v. *DeCasaus, supra,* 194 Cal.App.2d 666, 671; *People* v. *Phipps, supra,* 191 Cal.App.2d 448, 453; and see *People* v. *Shirley* (1961) 55 Cal.2d 521, 524 [11 Cal.Rptr. 537, 360 P.2d 33, 92 A.L.R.2d 413]; *People* v. *Ford* (1965) 236 Cal.App.2d 438, 441 [46 Cal.Rptr. 144], appeal dismissed 384 U.S. 100 [86 S.Ct. 1365, 16 L.Ed.2d 396]; *People* v. *Wood, supra,* 214 Cal.App.2d 298, 306.)

In *DeCasaus,* there was direct evidence to show that the defendant recipient did not live at the premises she represented as her home, but resided across the border in Mexico, and that she concealed the whereabouts of her husband who was seen with her in the same town across the border. In the remaining cases there was direct evidence to show that the husband or unrelated adult was in fact living with the family, and that such fact was concealed.

In the instant case, for the reasons stated above, the mis-

representation or concealment cannot be on the direct issue of separation or absence from the home. If it exists at all, it is in connection with the failure to reveal the joint applications for credit, the visits of defendant to the home, the trip to Long Beach, and defendant's intercourse with her husband and subsequent pregnancy.

There is no evidence to show that defendant was ever requested to or ever promised to report that she had attempted to secure credit.[8] In *People* v. *Martin* (1965) 237 Cal.App.2d 770 [47 Cal.Rptr. 337], the court reversed a conviction of grand theft predicated upon the father's failure to reveal the presence of an unrelated adult female in the home. The oath and promise were similar to those set forth above. The court concluded: "The welfare department, through the People, claims Martin was ineligible to aid for his children because department regulations (C-160, C-160.50) provide 'If a stepmother is living in the home with the child and his natural father, the child is not eligible on the basis of deprivation, since the stepmother is available to provide maternal care and supervision.' The welfare department orally interprets the word 'stepmother' to encompass an unrelated adult female living with a male recipient of aid to needy children. To say such does not make it so. The regulations and oath are inadequate; the prosecution sought to cure their inadequacy by oral interpretive testimony. Statutes and regulations from which criminal liability flow require, however, strict construction, and should be plainly written to give fair notice. (U.S. Const. Amend. XIV; *People* v. *McCaughan,* 49 Cal.2d 409 [317 P.2d 974].)

"The welfare department could have easily prevented the situation here by a specific written regulation providing that an unrelated adult female in the home barred eligibility to aid; coupling this with a provision in the oath requiring that information on the subject be reported would have assured knowledge by Martin and would have formed a proper basis for prosecuting him." (237 Cal.App.2d at p. 772.)

The reliance on the credit applications and the reference to the text and scripture concerning rule C-155 have raised a false scent which permeates the whole atmosphere of this case and make a reversal necessary. Section 1508 (Stats. 1961, ch. 2105, § 1, p. 4369, see present § 11351) deals with the

---

[8]There was no concealment of income in cash or kind received by defendant. The only property defendant received from these joint applications was some furniture for which she, herself, undertook to pay.

adjustment in the computation of the grant of aid "Where a needy child . . . *lives* with his mother and a stepfather or an adult male person assuming the role of spouse to the mother although not legally married to her . . ." (Italics added.) (See *People* v. *Bailey* (1961) 55 Cal.2d 514, 516-518 [11 Cal. Rptr. 543, 360 P.2d 39]; *People* v. *Shirley, supra,* 55 Cal.2d 521, 524-525; *People* v. *Ford, supra,* 236 Cal.App.2d 438, 441; *People* v. *Owens* (1965) 231 Cal.App.2d 691, 697 [42 Cal.Rptr. 153]; *County of Kern* v. *Colcy, supra,* 229 Cal.App.2d 172, 178; *People* v. *Wood, supra,* 214 Cal.App.2d 298, 302; *People* v. *Rozell, supra,* 212 Cal.App.2d 875, 877-878; and *People* v. *Flores* (1961) 197 Cal.App.2d 611, 615-616 [17 Cal.Rptr. 382].) Regulation C-155 is designed to apply to the situation where it is established that the unrelated adult male is in and around the home and is maintaining an intimate relationship with the mother in order to determine whether he is assuming the role of spouse. (California-SDSW-Manual-AFDC, Regulation C-155, rev. 767, effective 4/1/65.) The criteria set forth in the handbook are not designed to determine whether the adult male is living in the house, which is an established predicate, but to determine to what extent the relationship of the mother and the man living in the house is like that of husband and wife. Under these circumstances there can be no question of the relevancy of the criteria referred to in the handbook, namely: admitted intimate relationship and/or birth of children; opening charge accounts jointly for the use of the family; claiming children as dependents in filing income tax; man's use of address for mail or employment records. (See California-SDSW-Manual-AFDC-Handbook C-155, rev. 518, issued 6/1/63; *County of Kern* v. *Coley, supra,* 229 Cal. App.2d 172, 179; and *People* v. *Rozell, supra,* 212 Cal.App.2d 875, 876-877.)

Here there never was any question but that Ronnie was the husband of defendant and the father of the child, and as such liable for his support. Rule C-155 is therefore completely irrelevant and appears to have not only confused the welfare worker, but also the prosecutor, the court and the jury. If the County of Alameda were defrauded in this instance it was not because the father saw the mother occasionally, or because he attempted, jointly with her, to secure credit to purchase furnishings for her and her child, or because they went on a trip and conceived another child, but because the county failed to attempt to enforce the father's obligation to support the child with full knowledge of his residence address and the place of his employment.

It is arguable that defendant was remiss in failing to report the visits. There is a dispute as to just what she was requested to disclose in this connection. The general reference in the forms to "return to the home" is open to the interpretation that it means a return to living in the home. There is also a dispute as to the meaning of the promise used in the "Applicant's Statement" executed November 18, 1963 which reads, "To report immediately, and explain to my social worker, any relationship with any man whether living in my home or not." Under the premise of *Martin, supra*, the oral interpretation of the workers should not govern, and it is unnecessary to determine the effect of the discrepancy between the testimonies of the two welfare workers as to what was meant by "relationship." The fact is that official reliance in making payments should not be placed on the fact that a father did or did not visit in the home of his child. The handbook provides: "Visits of an absent parent to the home to see the child do not affect eligibility on the basis of absence. Such visits should be encouraged in most instances as one way of working toward the strengthening of family ties. (See Sec. C-312.11) Contributions of an absent parent to the support of the child do not affect eligibility on the basis of absence. Visits of short duration by the mother or children to see a departed father do not affect eligibility on the basis of absence. 'Short visits' should be interpreted as visits which in the aggregate do not result in a substantially normal family life for the parents and children on a continuing basis." (California-SDSW-Manual-ANC, Handbook, Issue No. 16-11, issued 5/1/57.)

 The trip, the admitted intimacies thereon, and the ensuing pregnancy raise more serious questions. Unquestionably during the trip the parties were living together as husband and wife and were not living separate and apart. The trip, however, did not affect the father's continued absence from the home which had been maintained by the mother and child before the trip, which home was not relinquished or abandoned at the time the trip was made and which constituted the domicile to which the mother and child, but not the father, returned on the completion of the trip. This was not like *DeCasaus* wherein a California home was unoccupied, and the presence of the husband and wife in Mexico was concealed. (194 Cal.App.2d 666, at pp. 671-672.)

At the time defendant applied for relief from Alameda County, section 1500 (see present § 11250) provided for assistance to children "deprived of parental support or care by the

reason of . . . continued absence from the home, . . . of a parent. . . ." (Stats. 1955, ch. 1956, § 1, p. 3586.) Amendments effective February 1, 1964 recast the section to provide for "Aid . . . to families with related children . . . in need thereof because they have been deprived of parental support or care due to: . . . (b) The divorce, separation or desertion of his parent or parents and resultant continued absence of a parent from the home for these or other reasons; . . ." (Stats. 1963, ch. 510, §§ 1.6, 1.7 and 40.5, pp. 1374 and 1391.)[9]

Reference to the applicable regulations and instructions (see fns. 5 and 6, *supra*) reemphasizes the conclusion that the critical element is continued absence from the home and that such absence is not destroyed by "visits which in the aggregate do not result in a substantially normal family life for the parents and children on a continuing basis." (Handbook 3—C-161.23, fn. 6, *supra*.) Therefore, in the absence of proof that the spouse was not absent from the home it is difficult to justify a finding that the concealment of the activities upon which the People rely can furnish the basis for a finding of the requisite intent to defraud, or a finding that the authorities justifiably relied upon the absence of those factors in making a payment.

This case appears to be governed by the comments found in the handbook under the heading "Determination of Deprivation By Reason of Continued Absence," which read as follows: "In determining eligibility on the basis of absence obtain and evaluate the following information: 1. The reason for the absence (informal separation, desertion, legal separation, never married, incarcerated, deported, etc.). 2. The circumstances surrounding the absence: date occurred; events leading up to the absence; time, duration, and frequency of previous absences, if any; dates, places, and types of court action if applicable; father's present whereabouts if known; etc. 3. The attitude of the parents toward each other and toward the children; present relationships; plans for the future; etc. (Also see sec. C-312.15)

"In most instances absence can be determined through information provided by the remaining parent; an evaluation of her attitude; and her statement of the absent parent's attitude, present relationship to his family, and his whereabouts. "*Where there is any question as to whether disassociation*

<hr />

[9]For background of the laws providing for aid or assistance to needy children see: tenBroek, *California's Dual System of Family Law: Its Origin, Development, and Present Status* (1964) 16 Stan.L.Rev. 257 and 900 and (1965) 17 *id.* 614, at 16 *id.*, pp. 944-953 and 17 *id.*, pp. 646-658.

*actually exists, it may be necessary to obtain further evidence from persons acquainted with the situation. . . .''* (California-SDSW-Manual-ANC-Handbook, Issue No. 16-12, issued 5/1/57; italics added.)

So here it appears that before a criminal conviction would be justified ''it may be necessary to obtain further evidence from persons acquainted with the situation'' as to whether the husband was absent from the home.

██ ''The Welfare and Institutions Code is to be administered with due consideration for the safeguarding of public funds as well as the needs of the applicant. (*People* v. *Rozell, supra,* 212 Cal.App.2d 875, 878; *People* v. *Shirley, supra,* 55 Cal.2d 521, 525.)'' (*County of Kern* v. *Coley, supra,* 229 Cal.App.2d 172, 179; and in addition to the cases cited see *People* v. *DeCasaus, supra,* 194 Cal.App.2d 666, 674.)[10]

██ The law should not countenance the creation of a fictitious situation whereby the appearance of separation and absence from home is merely a facade behind which a substantially normal life is conducted for the parents and child on a continuing basis.

On the other hand the same case recognizes: '' '[T]he State Social Welfare Board is without authority to adopt regulations designed to permit the collection of overpayments from recipients of aid under the Aid to Needy Children program in any case other than those involving actual fraud.' (23 Ops. Cal.Atty.Gen. 29, at p. 31.)'' (*Id.,* 229 Cal.App.2d, pp. 179-180.) The evidence of actual fraud upon which the prosecution relies falls short in that there is insufficient proof to establish the material misrepresentations and concealment dealing with the husband's actual presence in the home. It does not appear that all of the facts which concededly were not voluntarily divulged by the defendant were included within those which she promised or was requested to reveal. Nor does it appear that the disclosure of such facts would have materially affected her child's right to aid. The injury to the public, if any, in this case is not from the fact that defendant and her

---

[10]The magnitude of the field in which the problem exists is recognized by the following: ''Of a total of some 86,000 families receiving AFDC [1962], some 77,000 were cases in which the father was absent from the home.'' (tenBroek, *op. cit.,* 17 Stan.L.Rev. at p. 618.) It is also acknowledged that the problems of detection of fraud and enforcement of law are multifold. (*Id.,* at pp. 659-671; and see also *Parrish* v. *Civil Service Com.* *(1966, Cal.App.) 51 Cal.Rptr. 589.)

*A hearing was granted by the Supreme Court on August 24, 1966. The final opinion of that court is reported in 66 Cal.2d —— [57 Cal.Rptr. 623, 425 P.2d 223].

232 

husband may have comported themselves as husband and wife to a degree beyond that actually reflected, although possibly suggested, by the evidence, but that the husband was permitted to shift the responsibility for the support of his child from himself to the taxpayers. If he were possessed of sufficient means to pay this support he should have been called upon to pay it. (Former § 1506.5 (Stats. 1955, ch. 1253, § 1, p. 2286) present § 11350; and see former §§ 1570-1572 (Stats. 1961, ch. 1784, § 1, pp. 3795-3796, as amended by Stats. 1963, ch. 765, § 2, p. 1796) present §§ 11475-11477; and Pen. Code § 270.) Neither his complete absence from home nor his surreptitious enjoyment of his connubial privileges could abrogate that obligation. The further investigation which might have been made had defendant displayed more candor is one that should have been made in any event. It is only speculation to infer that it would have resulted in cessation of the right to aid because of the establishment of actual support from the father, or the establishment of nonseparation and nonabsence from the home.

The order admitting defendant to probation and each of the convictions on which it is predicated are reversed.

Sullivan, P. J., and Molinari, J., concurred.